KRAUS v. GENERAL MOTORS CORPO-
RATION et al.

No. 163.

Circuit Court of Appeals, Second Circuit.
May 26, 1941.

Before AUGUSTUS N. HAND and CHASE, Circuit Judges, and CLANCY, District Judge.

Edward E. Hoenig, of New York City (Edward E. Hoenig and Lester Hoenig, both of New York City, of counsel), for appellant.

John Thomas Smith, of New York City, for appellee General Motors Corporation.

Henry M. Hogan, of New York City (George A. Brooks, Gerard C. Smith, and Edward B. Wallace, all of New York City, of counsel), for appellee AC Spark Plug Co.

AUGUSTUS N. HAND, Circuit Judge.

The amended complaint contained four separate counts, of which the third was withdrawn by the plaintiff. Issues raised by the first, second and fourth counts, and the defendants' answers, were submitted to the jury which returned a verdict for the defendants. The plaintiff has appealed from the judgment entered on the verdict which, in our opinion, ought to be affirmed.

On July 1, 1919, the plaintiff Kraus and the defendant AC Spark Plug Company (hereafter called Champion) made an agreement under seal, whereby the latter was to use plaintiff's alleged secret process for increasing the plasticity and improving other qualities in porcelain body mixtures used for insulation in spark plugs to be manufactured and sold by Champion. The agreement provided for a disclosure by Kraus of his process and for an exclusive license to Champion of any patent issued therefor. The agreement also provided that manufacture by Champion should begin under the process on September 1, 1919, and likewise provided for payment by the latter to Kraus of a royalty of $.001 per each spark plug insulator body manufactured that embodied his process, and for the immediate payment to him by Cham-

pion of $10,000 which might be credited in pro rata monthly amounts against any royalties accruing under the agreement which were to be calculated at a minimum rate of 100,000 per day.

The agreement of July 1, 1919, was superseded by a contract dated February 7, 1920, which provided for a written disclosure by Kraus to Champion of his process so as to enable the latter "to commercially use the same in the manufacture of spark plug porcelains", and for an exclusive license under any patents therefor and for the payment of the same royalty as under the earlier agreement. The contract of February 7, 1920, provided that after the close of six months from its date Champion should pay Kraus a minimum royalty based on the production of 50,000 spark plugs per working day to continue during the life of the contract. The licensor was to furnish bentonite for the manufacture of spark plugs and Champion was to pay Kraus two cents per pound therefor.

Article Fifth of the contract of February 7, 1920, contained a cancellation clause reading as follows: "It is understood and agreed that Licensee may cancel this contract at any time within one year from the date hereof, and that at any time after one year from the date hereof Licensee may cancel this contract upon giving to the Licensor six months notice in writing, in either case if said cancellation is occasioned through failure of Licensor to secure and preserve patent protection, or in case said application for a patent covering said improvements shall be finally rejected or if thereafter said improvements shall become known and used by any other manufacturer of spark plug porcelains, or in case of failure of Licensor to supply Licensee with material in the manner set forth in the annexed agreement of purchase, then in any of such events Licensee shall have the right to cancel this agreement forthwith."

Kraus disclosed his process to Champion but, though it had some laboratory success, there was substantial evidence that it did not meet the requirements of commercial production. Accordingly, on October 28, 1920, the president of Champion notified Kraus in writing that he cancelled the contract and asked the latter for reimbursement stating in substance that bentonite, which under his process was to be introduced to impart plasticity to clay bodies, had been known and used in many arts for years and saying that the difficulty of shrinkage and air cracking had not only been found by Champion but had been experienced by others who had applied it to clay bodies. In 1938, eighteen years after the contract was cancelled, Kraus brought the present action against Champion and also against General Motors Corporation, which had become the owner of the stock of Champion and assumed its rights to manufacture spark plugs.

The first count of the amended complaint seeks to recover royalties under the contract of February 7, 1920, on the ground that the defendants had manufactured and sold spark plugs embodying the secret process of Kraus.

The second count seeks to recover damages for non-use of the Kraus secret process.

The fourth count seeks damages for fraud in that the defendants manufactured, sold and used spark plugs embodying the Kraus process and "deliberately concealed such use, manufacture and sale from him."

On a motion to dismiss made by the defendants at the close of the case the trial judge ruled, and thereafter in his charge instructed the jury, that "the contract as a matter of law was duly cancelled in October 1920". As the notice of cancellation was given during the first year after its date, but not during the first six months (in which the contract did not call for the payment of royalties), there was a period between August 7, 1920, the end of the six months, and October 28, 1920, the date of the letter of cancellation, during which royalties might have been earned. Whether they were earned during that period depended on whether the contract to furnish a commercially usable process was performed. The judge charged the jury that they would have to determine: "whether or not plaintiff * * * proved, * * * that during this period plaintiff's exclusive license covered a commercially usable process, and that said process was followed, used and made, or could have been so used and made into spark plug bodies by the defendants. If you are satisfied that the Kraus process was of no value to the defendants, and that it was not so used by the defendants during this period, then your verdict should be for the defendants on this cause of action. Otherwise you are at liberty to award the minimum royalty." Upon this charge the jury returned a verdict "for the defendants on all three counts."

■ The first and most vital question is whether the contract of February 7, 1920, was cancelled by the letter of Champion's president on October 28, 1920. We have no doubt that such was the effect of the letter and that Kraus hardly questioned that it was such at the time in spite of his expressions of surprise and disappointment and a desire to talk the matter over. In a letter of December 4, he said: "To cancel the contract without explaining as to why you have failed to use it commercially, or without requesting us to cooperate with you, seems to me to be inconsistent."

The right to cancel "at any time within one year from the date" of the contract was absolute so that at most nothing was recoverable but a relatively small sum for minimum royalties accruing during about two and one-half months even if the process was commercially usable.

■ The appellant makes the futile objection that the notice of cancellation was beyond the power of the president and required the action of the board of directors of Champion. This objection so far as the record discloses would equally apply to the contract itself which was not shown to have been authorized by the board. Entering into or cancelling a license agreement was not so unusual as to take it outside of the usual powers of the president of a corporation. Schwartz v. United Merchants & Mfrs., 2 Cir., 72 F.2d 256; Gerard v. Empire Square Realty Co., 195 App.Div. 244, 187 N.Y.S. 306. Moreover, the lapse of time and reliance by the defendants upon the defense of cancellation would in any event show ratification of the president's action.

■ We find no merit in appellant's contention that Article "Fifth" of the contract permitted cancellation only upon the failure of the licensor to secure and preserve patent protection or upon the happening of one of the three other contingencies mentioned therein. The Article gave a right of cancellation without limitation "at any time within one year from the date" and that was the right exercised. It went on to give a further absolute right to cancel "at any time after one year from the date * * * upon giving the Licensor six months notice in writing." Then ex abundante cautela the clause followed permitting cancellation "forthwith", upon the happening of any of four specified events irrespective of the prior requirement of six months notice. The words "in either case",

which would cover both the period of one year from the date of the contract and any subsequent periods, were unnecessary as applied to the period of one year during which the right of cancellation was absolute. They doubtless were introduced so that the right of immediate cancellation in the contingencies named should be indubitable, irrespective of all other provisions. We find no language which justifies appellant's claim that the meaning of the cancellation clause of the contract is ambiguous and should, therefore, have been left to the jury. Nor was the bringing of the suit in the New York Supreme Court in 1921 for the cancellation of the contract and the return of the $10,000 on the ground that Kraus had falsely represented that he had discovered a method of improving the plastic quality of porcelain a matter for the jury's consideration as bearing on the question whether the contract was cancelled on October 28, 1920. The suit in the State Court was abandoned. The complaint in that suit had alleged that Champion had notified Kraus of its intention to cancel the contract and had at the same time demanded that he restore all moneys paid in accordance with the terms of the agreement. The abandonment of the suit was no evidence that Champion gave up its claim that the contract had been cancelled under the provisions of Article Fifth, but Kraus' delay of eighteen years before bringing the present action affords a strong reason for supposing that he regarded his rights under the contract of February 7, 1920, as long since terminated, until some one advised him still to pursue a forlorn hope.

If the view we have taken as to the cancellation of the contract be correct it only remains to determine whether substantial evidence indicated that the Kraus process was not commercially usable. If, as the jury found, it was not thus usable, there could be no recovery of minimum royalties for the two and one-half months between the end of the six months and the date of notice of cancellation. Likewise, irrespective of any cancellation, Kraus could not recover for non-payment of royalties, or for breach of the contract, or in tort for fraud, because his process, which was the consideration for the defendants' obligations, was not commercially usable.

■ After careful examination of the record, we have no doubt that the proof that the process was not commercially

usable was very convincing. Under the contract the licensor agreed to disclose information as to improvements such as would "enable Licensee to commercially use the same in the manufacture of spark plug porcelains." The original agreement of July 1, 1919, which recited that Champion had tested the plastic and other qualities of batches of porcelain body mixture and "pronounced the qualities * * * to be greatly superior to the qualities of * * mixtures heretofore employed" by it and the various letters in which Champion approved laboratory mixtures tested by its experts cannot be regarded as creating an estoppel to question commercial usability. The original agreement was superseded by the contract of February 7, 1920, which recited that Kraus had discovered "certain alleged new and useful improvement in ceramics and more particularly a method for improving the plastic qualities of porcelain body mixture" and that Champion had "pronounced the result of the treatment * * * of porcelain bodies furnished by it to the Licensor to be entirely successful". While these recitals may have been some evidence of commercial usability, they were at best nothing more and certainly did not work an estoppel. The latter recital and the letters of commendation related to laboratory experiments which did not show a commercially successful product. An overwhelming amount of testimony indicates that the defendants had never used the process in the manufacture of spark plug porcelains and there is no evidence in the record to the contrary.

The only use of bentonite by Champion was in stencil paint and not as an ingredient of the porcelain insulator body of the spark plug. The suggestion that this use entitled the licensor to any royalty under the terms of the contract in suit can have no foundation.

The improvement patent taken out by Champion's chemist McDougal and assigned by him to it probably infringed the patent which Kraus finally obtained for his process. But the McDougal patent has no possible bearing on the issues before us. His process, like that of Kraus, was never used by the defendants and the Kraus process has been found by the jury to be nonusable commercially.

The result of the foregoing is that Kraus failed to perform his contract by disclosing a commercially usable process and that Champion cancelled the agreement pursuant to its express terms. Under such circumstances Kraus had no right of action against the defendants either in contract or tort.

Judgment affirmed.